IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

VARENTEC, INC.,

     Plaintiff,

v.

GRIDCO, INC., and DOES 1-10,

     Defendants.

Civil Action No. 16-217-RGA

## MEMORANDUM OPINION

Philip A. Rovner, Esq., David E. Moore, Esq., Alan R. Silverstein, Esq., Potter Anderson &
Corroon LLP, Wilmington, DE; Stephen S. Korniczky, Esq., Michael Murphy, Esq., Sheppard
Mullin Richter & Hampton LLP, San Diego, CA; Bruce G. Chapman, Esq., Sheppard Mullin
Richter & Hampton LLP, Los Angeles, CA, attorneys for Plaintiff Varentec, Inc.

Steven J. Balick, Esq., Lauren E. Maguire, Esq., Andrew C. Mayo, Esq., Ashby & Geddes, P.A.,
Wilmington, DE; Christopher C. Campbell, Esq., Erik B. Milch, Esq., Stephen C. Crenshaw,
Esq., Kevin A. Lake, Esq., Cooley LLP, Reston, VA; Liz Trafton, Esq., Cooley LLP, Boston,
MA, attorneys for Defendant Gridco, Inc.

October 3, 2016

1

*Richard G. Andrews*

**ANDREWS, U.S. DISTRICT JUDGE:**

Presently before the Court is Plaintiff's motion for preliminary injunction. (D.I. 18). The issues have been fully briefed. (D.I. 19, 26, 35, 97, 100). The Court held a hearing on August 17, 2016. (D.I. 93). For the reasons stated herein, Plaintiff's motion for preliminary injunction is **DENIED**.

## I.    BACKGROUND

On April 1, 2016, Plaintiff Varentec filed this patent infringement lawsuit against Defendant Gridco and Does 1-10, alleging infringement of U.S. Patent Nos. 9,293,922 ("the '922 patent") and 9,014,867 ("the '867 patent"). (D.I. 1). On June 3, 2016, Plaintiff moved for a preliminary injunction. (D.I. 18).

The claimed inventions relate to grid edge voltage control for use in a power grid. '867 patent Abstract.[1] Traditionally, in a power grid, power is delivered from a power substation to end consumers or "loads."[2] (D.I. 21 ¶ 4). More specifically, medium voltage is transmitted from the substation to service transformers, which then reduce the voltage to the low voltage electricity used by the loads. (*Id.*). The modern distribution grid must be able to absorb "high levels of distributed [power] generation — such as solar generation," to "adapt[] to time-varying loads." (D.I. 21 ¶ 6). Thus, there is a need to control voltage, "where the goal is to flatten and

---

[1] The '922 patent is a continuation of the application which ultimately issued as the '867 patent. As noted by Plaintiff, "[t]here's very little difference" between the two patents. (D.I. 93 at 6:4-10). While citations will generally be made to the '867 patent's specification, such citations will generally apply equally to the '922 patent.

[2] As an example, the parties refer to loads as individual households, but a load could refer to any consumer of electric power, such as machinery.

2

lower the voltage profile along the electric distribution grid to achieve demand and energy consumption reduction." (*Id.* ¶ 7).

In the claimed invention, voltage is regulated on the low-voltage, consumer-side of the service transformer. (D.I. 93 at 43:4-9). In other words, regulation occurs "at the edge or near the edge of the distribution power network." '867 patent at 2:32-33. To regulate voltage, the claimed invention employs "a plurality of shunt-connected, switch-controlled VAR sources." *Id.* at 2:27-28. These are also referred to as "VAR compensators." (D.I. 93 at 42:25-43:14). VAR stands for "volt-ampere reactive," and is a unit which "measure[s] of the efficiency at which electricity flows from one point to another." (*Id.* at 42:1-4). "Specifically, a VAR is the ratio of the so-called real power, the power that does work, . . . to the volts times the amps in an AC system." *(Id.* at 42:5-7).

Numerous VAR compensators distributed in the system allow for greater "granularity of control." (*Id.* at 43:10-44:2). In other words, with voltage regulation positioned near the load, the operator of a power distribution network can exercise precise control over voltage compensation. (*Id.*). This system has some potential problems, however. When VAR compensators are positioned close to each other, an "infighting problem" can occur. (*Id.*at 44:3-8). That is, when monitoring voltage, the VAR compensators may all act at the same time, thereby overcompensating the system. (*Id.* at 44:9-17). Then, reacting to their own overcompensation, the VAR compensators may all turn off at the same time, resulting an oscillation effect. (*Id.*). Put another way, a number of VAR compensators all monitor voltage near the loads. They might all determine that voltage is low, and try to inject some VARs to raise the voltage. The next time the VAR compensators monitor the voltage, they detect that it is too

3

high, so they all turn off. (*Id.*; *see also id.* at 13:1-15). Thus, multiple VAR compensators acting at the same time may "cause[e] . . . instability by pushing the voltage too high, and then acting again, and pushing it too low." (*Id.* at 47:4-23).

The '867 and '922 patents solve this infighting problem through the use of delayed, non-continuous monitoring. Claim 1 of each patent requires that each VAR compensator wait for a delay before evaluating the proximate voltage. '867 patent at 25:33-37. The delays associated with each of the VAR compensators are different. *Id.* at 23:43-45. As a result, multiple VAR compensators will not be operating at the same time. (D.I. 93 at 47:18-23, 51:16-20). This avoids the overcompensation that results from infighting between the VAR compensators.

Claim 1 of the '867 patent reads:

1. A system comprising:

a distribution power network;

a plurality of loads at an edge of the distribution power network, each of the plurality of loads configured to receive power from the distribution power network; and

a plurality of shunt-connected, switch-controlled Volt-Ampere Reactive ("VAR") sources at the edge of the distribution power network, each of the plurality of shunt-connected, switch-controlled VAR sources configured to detect a proximate voltage at the edge of the distribution power network, each of the plurality of shunt-connected, switch-controlled VAR sources comprising a processor and a VAR compensation component, the processor configured to:

enable the corresponding shunt-connected, switch-controlled VAR source to non-continuously monitor the proximate voltage by waiting for a delay and then evaluating the proximate voltage to determine, after the delay, whether to enable the corresponding VAR compensation component based on the proximate voltage; and

adjust network VAR by controlling a switch to enable the corresponding VAR compensation component based on the determination;

4

wherein the delay extends *for a predetermined length of time*;

wherein *the delay of each of the plurality of shunt-connected, switch-controlled VAR sources is not equal*.

'867 patent at 25:17-45 (emphasis added). Claim 1 of the '922 patent reads:

1. A system comprising:

a distribution power network;

a plurality of loads at an edge of the distribution power network, each load configured to receive power from the distribution power network; and

a plurality of shunt-connected, switch controlled Volt-Ampere Reactive ("VAR") sources, wherein each VAR source is located at or near the edge of the distribution power network, is configured to non-continuously monitor and detect a proximate voltage at or near the edge of the distribution power network, and comprises a processor and a VAR compensation component, the processor configured to enable the VAR source to determine, after a delay, whether to enable the VAR compensation component based on the proximate voltage and adjust network volt-ampere reactive by controlling a switch to enable the VAR compensation component based on the determination;

wherein *the delay associated with each VAR source extends for a predetermined length of time that is not equal to the delay associated with any other of the plurality of VAR sources*.

'922 patent at 25:29-50 (emphasis added).

Plaintiff accuses Defendant's SVC-20 devices of infringing claim 1 of the '867 and '922

patents. Specifically, Plaintiff contends that these devices infringe when operating in "caution

mode." (D.I. 93 at 45:24-46:11). An SVC-20 device enters caution mode when it detects an

"oscillation between low or high, or high and low, and . . . knows there is a possibility of

infighting." (*Id.*; *see also id.* at 13:7-19).

Defendant's expert, Dr. Pedram, provided an explanation of how SVC-20s function when

in caution mode. Upon entering the caution mode, the first thing the SVC-20s do is detect the

line voltage. (*Id.* at 108:10-109:23). If the SVC-20s detect a voltage "overshoot,"—i.e., overcompensation as a result of infighting—they continue in caution mode. (*Id.*). If they do not detect such an overshoot, they immediately exit the caution mode. (*Id.*). After checking the voltage, the SVC-20s perform a "coin flip." (*Id.*). If the result of a coin flip is heads, a "success," then that particular SVC-20 will immediately "remove or add the VAR source," whichever is appropriate. (*Id.*). If the result of a coin flip is tails, then that particular SVC-20 will do nothing. (*Id.*). Regardless of the outcome of the coin flip, each SVC-20, after performing the coin flip, will "wait for 15 cycles before going back to the beginning of the process that repeats for as long as needed." (*Id.*). To summarize, the SVC-20s will (1) measure voltage; (2) determine whether to continue or to exit the caution mode; (3) flip a coin, the outcome of which determines whether an action is taken; and (4) wait 15 cycles. (*Id.*).[3] These steps will repeat until the SVC-20 measures voltage, determines that there is no voltage abnormality—i.e., an overshoot, and exits the caution mode. (*Id.* at 108:18-20, 109:12-14).

## II.    LEGAL STANDARD

Pursuant to 35 U.S.C. § 283, a court in a patent case "may grant injunctions in accordance with the principles of equity to prevent the violation of any right secured by patent,

---

[3] In its papers, Plaintiff, citing to the Rule 30(b)(6) deposition of Mr. James Simonelli, argues that the SVC-20 flips a coin, and then delays 15 cycles before taking an action. (D.I. 82 at 5-6; D.I. 97 at 5-6; *see also* D.I. 84 ¶¶ 12-13, 17). That is incorrect. Mr. Simonelli explained that "[t]he only way you exit caution mode is the voltage has to be within range, which is based on a measurement. The coin flip just determines whether or not you are going to . . . take any action, and in both cases, you always wait 15 cycles." (D.I. 85, Ex. F at 21:23-22:3). Plaintiff asked for clarification: "If you flip a coin and that says to [take an action], you would wait 15 cycles, take a measurement, and then [take that action], is that correct?" (*Id.* at 22:20-23). Mr. Simonelli answered: "No. We would take the action and then wait the 15 cycles." (*Id.* at 22:24-25).

6

on such terms as the court deems reasonable." 35 U.S.C. § 283.[4] "The grant or denial of a preliminary injunction under 35 U.S.C. § 283 is within the sound discretion of the district court." *Abbott Labs. v. Andrx Pharm., Inc.*, 452 F.3d 1331, 1334 (Fed. Cir. 2006). The Federal Circuit has "cautioned, however, that a preliminary injunction is a drastic and extraordinary remedy that is not to be routinely granted." *Intel Corp. v. ULSI Sys. Tech., Inc.*, 995 F.2d 1566, 1568 (Fed. Cir. 1993).

To obtain a preliminary injunction, a movant must establish: "(1) a reasonable likelihood of success on the merits; (2) irreparable harm if an injunction is not granted; (3) a balance of hardships tipping in its favor; and (4) the injunction's favorable impact on the public interest." *Amazon.com, Inc., v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1350 (Fed. Cir. 2001). "These factors, taken individually, are not dispositive; rather, the district court must weigh and measure each factor against the other factors and against the form and magnitude of the relief requested." *Hybritech Inc. v. Abbott Labs.,* 849 F.2d 1446, 1451 (Fed. Cir. 1988). The Federal Circuit, however, has placed particular emphasis on the first two factors: "a movant cannot be granted a preliminary injunction unless it establishes *both* of the first two factors, *i.e.*, likelihood of success on the merits and irreparable harm." *Amazon.com*, 239 F.3d at 1350 (emphasis in original). Accordingly, "[w]hile granting a preliminary injunction requires analysis of all four factors, a trial court may . . . deny a motion based on a patentee's failure to show any one of the four factors—especially either of the first two—without analyzing the others." *Jack Guttman, Inc. v. Kopykake Enters., Inc.*, 302 F.3d 1352, 1356 (Fed. Cir. 2002); *see also Amazon.com*, 239 F.3d at

---

[4] "[A]lthough a procedural matter," because motions under 35 U.S.C. § 283 "involve[] substantive matters unique to patent law," they are governed by the law of the Federal Circuit. *See Hybritech Inc. v. Abbott Labs.*, 849 F.2d 1446, 1451 n.12 (Fed. Cir. 1988).

1350; *Chrysler Motors Corp. v. Auto Body Panels of Ohio, Inc.*, 908 F.2d 951, 953 (Fed. Cir. 1990) ("If the injunction is denied, the absence of an adequate showing with regard to any one factor may be sufficient, given the weight or lack of it assigned the other factors, to justify the denial.").

## III. DISCUSSION

"[T]o demonstrate a likelihood of success on the merits, the patentee must demonstrate that it will likely prove infringement of one or more claims of the patents-in-suit, and that at least one of those same allegedly infringed claims will also likely withstand the validity challenges presented by the accused infringer." *Amazon.com*, 239 F.3d at 1350. If the accused infringer "raises a 'substantial question' concerning validity, enforceability, or infringement (*i.e.*, asserts a defense that [the patentee] cannot show 'lacks substantial merit') the preliminary injunction should not issue." *Genentech, Inc. v. Novo Nordisk A/S*, 108 F.3d 1361, 1364 (Fed. Cir. 1997) (quoting *New England Braiding Co. v. A.W. Chesterton Co.*, 970 F.2d 878, 883 (Fed. Cir. 1992)).

In this case, the likelihood of success inquiry focuses on Plaintiff's infringement theory. A patent is infringed when a person "without authority makes, uses, offers to sell, or sells any patented invention, within the United States . . . during the term of the patent . . . ." 35 U.S.C. § 271(a). A two-step analysis is employed in making an infringement determination. *See Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996). First, the court must construe the asserted claims to ascertain their meaning and scope. *See id.* The trier of fact must then compare the properly construed claims with the accused infringing product. *See id.* at 976. This second step is a question of fact. *See Bai v. L & L Wings, Inc.*, 160 F.3d 1350, 1353 (Fed. Cir. 1998).

8

"Literal infringement of a claim exists when every limitation recited in the claim is found in the accused device." *Kahn v. Gen. Motors Corp.*, 135 F.3d 1472, 1477 (Fed. Cir. 1998). "If any claim limitation is absent from the accused device, there is no literal infringement as a matter of law." *Bayer AG v. Elan Pharm. Research Corp.*, 212 F.3d 1241, 1247 (Fed. Cir. 2000). A product that does not literally infringe a patent claim may still infringe under the doctrine of equivalents if the differences between an individual limitation of the claimed invention and an element of the accused product are insubstantial. *See Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 24 (1997). The doctrine of equivalents must be applied to the "individual elements of the claim, not to the invention as a whole." *Id.* at 29. An accused element is equivalent if the differences between the element and the claim limitation are "insubstantial." *Zelinski v. Brunswick Corp.*, 185 F.3d 1311, 1316 (Fed. Cir. 1999). An accused element may be found to be equivalent if it performs substantially the same function in substantially the same way to obtain substantially the same result as the claim limitation. *See Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*, 339 U.S. 605, 608 (1950). The patent owner has the burden of proving infringement and must meet its burden by a preponderance of the evidence. *See SmithKline Diagnostics, Inc. v. Helena Lab. Corp.*, 859 F.2d 878, 889 (Fed. Cir. 1988) (citations omitted).

Plaintiff has not carried its burden of showing that it will "likely prove infringement" of the asserted claims.[5] The accused product does not literally satisfy the "predetermined length of

---

[5] Plaintiff argues that it has shown infringement of claim 1 in both the '867 patent and the '922 patent. While the analysis here focuses on the relevant limitations within claim 1 of the '867 patent, there are "[e]quivalent limitations" in claim 1 of the '922 patent.

9

time limitation," but does satisfy that limitation under the doctrine of equivalents. The accused product does not satisfy the unequal delays required by claim 1.

## A. Predetermined Length of Time

Claim 1 requires that the VAR source "wait[] for a delay" before "evaluating the proximate voltage to determine . . . whether to enable the corresponding VAR compensation component." '867 patent at 25:33-36. That "delay extends for a predetermined length of time." *Id.* at 25:41-42. Plaintiff argues that "predetermined" should be given its plain and ordinary meaning, and "that the plain and ordinary meaning of predetermined includes determining the end of the delay in advance, regardless of whether or not the end is determined before or after the delay starts." (D.I. 97 at 5). In other words, Plaintiff argues that, where the end of a delay is known in advance of the delay actually ending, the length of that delay is "predetermined." (D.I. 93 at 50:14-19).

In support of its interpretation, Plaintiff cites a dictionary for the following definition: "to decide something before it happens." (D.I. 93 at 16:1-4). This definition follows from the basic structure of the word—i.e., the prefix "pre-" envisions a determination occurring before something else happens. In the '867 patent, the thing which is predetermined is the "length of time" of the "delay." '867 patent at 25:41-42. The prosecution history confirms this reading, as the applicant equated a predetermined length of time with a delay. (D.I. 101, Ex. 13 at 15 ("The amended claims recite non-continuous monitoring of the proximate voltage, such that VAR source waits for a pre-determined length of time (i.e., a delay) before the VAR source determines whether to enable the corresponding VAR compensation component.") (emphasis in original)). The most natural reading is that the length of the delay must be determined before it begins. If

10

the length of the delay could be determined at any time during the delay, it would not be of predetermined length.

Plaintiff contends otherwise, arguing that the length of a delay is predetermined, so long as the end of the delay is determined before the delay actually ends. In support of its construction, Plaintiff notes that the specification teaches that the "[t]he delay may be randomly set." '867 patent at 12:2-3. Additionally Plaintiff cites to the specification's discussion of step 608, which relates to the "the controller 426 . . . delay[ing] [the] switching [of] the VAR compensation component for a predetermined time." *Id.* at 16:46-47. In discussing step 608, the specification provides that

> [i]n some embodiments, if detected voltage is changing at a substantial rate, the delay time may be accelerated. Those skilled in the art will appreciate that there may be many different ways to provide, update, and/or alter the delay time of a switch-controlled VAR source.

*Id.* at 16:66-17:4. These cited passages, Plaintiff argues, show that the length of time may be altered mid-delay. I disagree. While the specification contemplates accelerating the delay time, it does not suggest that such an acceleration occurs mid-delay. Further, a delay that is randomly set can be determined mid-delay or before the delay begins. Under Plaintiff's construction, a length of time is predetermined if, at the moment the delay ends, one can look back and assess the length of the delay. Nothing in the specification or the claims commands such a peculiar reading. I therefore reject Plaintiff's proposed construction of "predetermined length of time." The length of a delay is not predetermined if the end is not determined until after the delay begins.

The accused SVC-20 does not satisfy the "predetermined length of time" limitation. In caution mode, an SVC-20 determines whether or not to take a VAR compensation action based

11

on a coin flip. That is, the delay that occurs before "evaluating the proximate voltage to
determine, after the delay, whether to [take an action]," depends on the outcome of the coin-
flipping process. '867 patent at 25:34-36. There is no way to determine the length of the delay
in advance of when it ends, since the end is determined by the coin flip. (D.I. 93 at 112:3-113:4;
*see also id.* at 108:10-109:6).

Plaintiff argues that, even if it cannot show literal infringement, Defendant's SVC-20
infringes under the doctrine of equivalents. Plaintiff contends that the SVC-20 "performs
substantially the same function (implementing delays for injecting VAR), in substantially the
same way (setting an algorithm to measure proximate voltage and then to determine how long to
delay an injection of VAR), to achieve substantially the same result (avoiding infighting of
multiple VAR sources by staggering VAR injection)." (D.I. 97 at 6). In other words, Plaintiff
maintains that "[d]etermining the end of the delay period before the delay period has begun is
insubstantially different from determining the end of the delay after the delay period begins."
(*Id.*). Dr. Habetler specifically cites the specification language, which notes that "those skilled in
the art will appreciate that there may be many different ways to provide, update, and/or alter the
delay time of a switch-controlled VAR source." '867 patent at 17:1-4; (D.I. 84 ¶ 19). Because
the purpose of the delay is to stop infighting, so "long as you have different delays," however or
whenever those delays are set, "that's what is key." (D.I. 93 at 51:8-52:8).

Defendant did not rebut this testimony. Instead, Defendant noted that there is "no delay
following the coin flip," and therefore, "determining the end of the delay period before the delay
period has begun is indeed more than insubstantially different from [determining] the end of the
delay after the delay period begins." (D.I. 100 at 6 n.3 (emphasis omitted)). This argument does

12

not address Plaintiff's position. Plaintiff contends that, regardless of when the end of a delay is determined, the limitation is satisfied. On this limited record, I conclude that Plaintiff is likely to succeed on the merits in relation to this disputed issue.

## B. Unequal Delays

The accused SVC-20 product lacks the "unequal delays" limitation, which requires that "the delay of each of the plurality of shunt-connected, switch-controlled VAR sources is not equal." '867 patent at 25:43-45. In the SVC-20, the coin-flipping process will likely result in some SVC-20s having unequal delays. (D.I. 93 at 113:17-24).

Since, statistically speaking, some subset of SVC-20s will have different delays, Plaintiff argues the limitation is satisfied. (D.I. 97 at 8-9). In other words, Plaintiff contends that so long as some subset of SVC-20s have unequal delays, that subset constitutes a "plurality," '867 patent at 25:43-45, and Defendant "cannot avoid infringement merely by adding elements if each element recited in the claims is found in the accused device." *Stiftung v. Renishaw PLC*, 945 F.2d 1173, 1178 (Fed. Cir. 1991) (quoting *A.B. Dick Co. v. Burroughs Corp.*, 713 F.2d 700, 703 (Fed. Cir. 1983)). "The addition of more VAR sources with delay periods that are equal will not avoid infringement." (D.I. 97 at 10). Plaintiff argues that the specification supports this reading, as the Summary of the Invention states that "the delay of at least two of the plurality of shunt-connected, switch-controlled VAR sources may be equal but the delay of a third of the plurality of shunt-connected, switch-controlled VAR sources may not be equal to the other two VAR sources." '867 patent at 2:46-50.

Plaintiff's interpretation must be rejected. The claim refers to "*the* plurality of shunt-connected, switch-controlled VAR sources." *Id.* at 25:43-45. The use of the definite article "the"

13

refers back to the same plurality which is mentioned earlier in the claim—to wit, "a plurality of shunt-connected, switch-controlled Volt-Ampere Reactive ("VAR") sources at the edge of the distribution power network." *Id.* at 25:22-24. Thus, each device that comprises the plurality of shunt-connected, switch-controlled VAR sources, must have a delay that is not equal to that of any other device. This reading is consistent with the goals of the invention. As explained by Plaintiff's expert, Dr. Habetler, "the idea [of the invention] is to stop the infighting. And the only way you can stop the infighting is to have multiple units not operating at the same time. . . . As long as you have different delays, that's what is key." (D.I. 93 at 51:16-52:8). Put another way, the success of the claimed invention depends on each of the devices acting, to inject or to remove VARs, at different times. That is how the claimed invention solves the infighting problem. As Plaintiff's counsel explained:

> [Y]ou've got these devices spread throughout the network, and they are all going to look at the voltage. And they are all going to act to inject VARs to try to stabilize the voltage, but they are going to do it at different times, so that one can see the effect of the other one's actions before it acts.

(*Id.* at 7:5-10). If only some subset of devices have unequal delays, there may be infighting among the subsets of devices with equal delays. The '922 patent makes this even more explicit, as it requires, in claim 1, that "the delay associated with each VAR source extends for a predetermined length of time that is not equal to the delay associated with any other of the plurality of VAR sources." '922 patent at 25:47-50.

Plaintiff's reliance on certain language in the Summary of the Invention is misplaced. That language is almost identical to the language of unasserted claim 3 of the '867 patent. Claim 3 requires that "the delay of at least two of the plurality of shunt-connected, switch-controlled VAR sources is equal but the delay of a third of the plurality of shunt-connected, switch-

14

controlled VAR sources is not equal." '867 patent at 26:9-12. Since the language identified by Plaintiff is set forth as a separate limitation in a different claim, it is not particularly probative as to claim 1, which does not contain the same language.

While some subset of SVC-20s will likely have unequal delays, claim 1 requires that the predetermined delays of "each" of the plurality of SVC-20s "is not equal." That is not the same thing as "the predetermined delays of at least one of the plurality of SVC-20s is not equal." Therefore, the accused product does not satisfy this limitation.

Plaintiff has not carried its burden of showing that "it will likely prove infringement of" claim 1. *Amazon.com*, 239 F.3d at 1350. Defendant has raised more than a "'substantial question' concerning . . . infringement." *Genentech*, 108 F.3d at 1364 (quoting *New England Braiding*, 970 F.2d at 883). I therefore conclude that Plaintiff has failed to show a likelihood of success on the merits. Having so concluded, I need not address the other three preliminary injunction factors. *Jack Guttman*, 302 F.3d at 1356.

## IV.   CONCLUSION

For the reasons stated above, Plaintiff's motion for preliminary injunction is **DENIED**.

15